**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DELAWARE AUDUBON | : | CIVIL ACTION |
| SOCIETY, et al., | : | |
|          Plaintiffs, | : | |
| | : | |
|     v. | : | |
| | : | |
| KEN SALAZAR, et al., | : | NO. 1:10-CV-00985 |
|         Defendants. | : | |

<u>**MEMORANDUM OPINION**</u>

**TIMOTHY R. RICE**                                              **September 16, 2011**
**U.S. MAGISTRATE JUDGE**

        Plaintiffs Delaware Audubon Society and Public Employees for Environmental

Responsibility ("PEER") oppose a plan by the United States Fish and Wildlife Service ("FWS")

to build berms and repair sand dunes on and adjacent to the Prime Hook National Wildlife

Refuge ("the Refuge," and "the Project").  Plaintiffs seek relief under the Administrative

Procedures Act ("APA"), 5 U.S.C. § 551 et seq., the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4331 et seq., and the National Wildlife Refuge System Improvement Act

("RIA"), 16 U.S.C. § 668dd et seq.[1]  The parties have filed cross-motions for summary

judgment.

        The question of how to best manage the long-term needs of the Refuge is unclear.

Therefore, the FWS has defined the Project as a short-term, stopgap measure to preserve current

conditions at the Refuge while it crafts a long-term refuge management plan.  Because the record

demonstrates the FWS followed the required procedures under NEPA and RIA, and for the

---

[1]      Defendants are United States Department of the Interior Secretary Ken Salazar, FWS
Acting Director Rowan Gould, and the FWS.  They do not contest Plaintiffs' standing to
bring this action.

reasons that follow, I cannot conclude the FWS acted arbitrarily or capriciously, abused its discretion, or otherwise acted in violation of law.  I grant Defendants summary judgment on all claims.

## I.     FACTUAL BACKGROUND

### A.     The Refuge

Located in Sussex County, Delaware, the Refuge was established in 1963 as a sanctuary for migratory birds.  R. at 15, 21.[2]  As the Refuge acquired more land, its purpose expanded to include "incidental fish and wildlife-oriented recreation development," "protection of natural resources," and "conservation of endangered species."  R. at 21.  The Refuge now contains more than 10,000 acres of land along the Delaware Bay, id., including vast coastal marshes, R. at 15. Divided into four units, the Refuge has managed two areas as salt marshes (Units I and IV), and two areas as fresh or slightly brackish water pond habitats (Units II and III).  R. at 15-16.  Unit II -- the Refuge's northern freshwater marsh -- is bounded at the north by Fowler Beach Road, and at the south by Prime Hook Road.  R. at 16.  Units I and II are bounded to the east by "a continuous ribbon of a narrow band of sandy coastal barrier island beach."  R. at 16-17, 23.

Because of its undeveloped barrier islands and coastal marshes, the Refuge is a "priority conservation habitat."  R. at 32.  It is used by horseshoe crabs for spawning, shorebirds and osprey for nesting, and shorebirds and other birds during migration.  R. at 31-32.  Along with other similar habitats along the Delaware Bay, the Refuge "support[s] a noteworthy shorebird migration that has worldwide ecological significance," and "remain[s] one of the region's and

---

[2]      The administrative record contains more than 12,500 pages, along with several maps and videos.  The pages are numbered, beginning with "FWS000001."  I will cite to the record as "R. at [page #]," eliminating the "FWS" and any zeroes preceding the page number.

Western Hemisphere's most important migratory stopovers for hundreds of bird species." R. at 32. Its inhabitants feature two federally protected endangered species -- the piping plover and the Delmarva fox squirrel -- and several other species considered threatened or endangered by the state of Delaware. R. at 5.

Beginning in the 1990s, small segments of the dune line along the eastern edge of Units I and II experienced periodic overwashes and breaches as a result of rising sea levels and storms that have increased in both strength and frequency. R. at 17, 29. Portions of the dune line along those Units are owned by the Refuge, but substantial segments are private property. R. at 19, 24. Delaware's Department of Natural Resources and Environmental Control ("DNREC") assists with water management on the refuge. R. at 2442. On several occasions between 1990 and 2006, DNREC reinforced the shoreline on the barrier islands along Units I and II by scraping sand east from overwash areas to create dunes. R. at 17, 2132, 4234, 4242. In 2008, the FWS similarly rebuilt dunes on both Refuge and private land along Unit II.[3] R. at 18, 1548, 1599, 1635, 1640.

## B. The Project

Since 2008, new breaches and overwashes have formed along the dunes separating Unit II from the Delaware Bay. R. at 18-19, 30. These incursions allow saltwater from the Bay to flow in and out of Unit II twice daily with the tides. R. at 18. As a result, much of the Unit's freshwater vegetation has died, salt-tolerant plants are beginning to grow, and some marsh areas have converted to open water. Id. Local residents from the Prime Hook Beach community -- comprised of about 200 homes with both full-time and seasonal residents, and located on the

---

[3]      At the time of the 2008 repairs, the Refuge decided to cease rebuilding dunes along Unit I -- a salt marsh -- and permit it to "function naturally." R. at 17.

barrier island along the southern portion of Unit II -- complain that the existing breaches have exacerbated flooding.  R. at 38.  This sometimes renders the community's only access road impassable.  Id.

The FWS is studying the present conditions in Unit II to determine the best long-term management plan for that portion of the Refuge.  R. at 21.  In the meantime, however, it plans to partner with DNREC and rebuild the dune line along Unit II once more, hoping to preserve current conditions for further study and prevent anticipated harms from a continued rapid influx of saltwater.  Id.  It fears the loss of the foundational peat layer beneath the marsh's vegetation and loss of marshland to open water, both of which would complicate efforts to restore any marsh system.  Id.

Before embarking on its dune restoration project, the FWS performed an Environmental Assessment ("EA") and invited public comment.  R. at 11-81.  The final EA, published in November 2010, spans more than sixty pages, examines three alternative actions in depth, explains why four other actions were rejected without detailed analysis, reviews relevant scientific research, discusses possible impacts on six aspects of the environment, and addresses public concerns.  Id.  Ultimately, the FWS decided to proceed with the Project using sand scraped from overwash areas within the Refuge, supplemented with sand trucked in from other locations.  R. at 29.  Its decision was based on the EA's conclusion that, for purposes of NEPA, the Project would not significantly impact the environment.  R. at 82-85.  The FWS also issued a Compatibility Determination ("CD") pursuant to the RIA, finding the Project would neither materially interfere with, nor detract from, the mission of the System or the purpose of the Refuge.  R. at 1-10.

The FWS intends to launch the Project on September 26, 2011.

4

C.      The Lawsuit

Plaintiffs filed their complaint on November 17, 2010.  See Compl., Del. Audubon Soc'y

v. Salazar, No. 10-985 (D. Del. Nov. 17, 2010).  They characterize the Project as "use [of]

federal funds to benefit private land owners in a way which has potentially harmful effects on

federally listed species and habitat, as well as the integrity of the Refuge and its natural

resources."  Id. at 2.  Plaintiffs seek declarations that Defendants have violated NEPA, the RIA,

and the APA, along with an injunction preventing the Project from proceeding until further

environmental studies are conducted.  Id. at 2, 11-12.

On June 1, 2011, Plaintiffs moved for summary judgment based on the undisputed facts

contained in the administrative record.  See Pls.' Mem. Law Supp. Mot. Summ. J. at 1, Del.

Audubon Soc'y v. Salazar, No. 10-985 (D. Del. June 1, 2011) [hereinafter Pls.' Br.].  Plaintiffs

argue Defendants violated NEPA in the following three ways: (1) by issuing an EA describing a

proposed action that will not accomplish the stated purpose, and lacking consideration of

reasonable alternatives; (2) by giving inadequate consideration to context and intensity factors

used to measure an action's significance under NEPA; and (3) by determining the Project would

have no significant environmental impacts before completing the EA.  Id. at 9-36.  Plaintiffs also

assert three violations of the RIA: (1) permitting a use of refuge resources that would interfere

with and detract from the mission of the National Wildlife Refuge System ("the System") and

the purposes of the Refuge; (2) failing to use sound professional judgment in assessing the

compatibility of the Project with the purposes of the Refuge; and (3) permitting an economic use

of refuge resources without a sufficient compatibility determination or required permits.  Id. at

36-42.

Defendants responded with a cross-motion for summary judgment on July 1, 2011,

disputing each of Plaintiffs' claims.  See generally Mem. Supp. Defs.' Cross-Mot. Summ. J. &

Opp'n Pls.' Mot. Summ. J., Del. Audubon Soc'y v. Salazar, No. 10-985 (D. Del. July 1, 2011)

[hereinafter Defs.' Br.].  Both parties filed reply briefs.  See Combined Reply Br. Supp. Pls.'

Mot. Summ. J. & Br. Opp'n Defs.' Cross-Mot. Summ. J., Del. Audubon Soc'y v. Salazar, No.

10-985 (D. Del. July 14, 2011) [hereinafter Pls.' Reply]; Reply Pls.' Opp'n Defs.' Cross-Mot.

Summ. J., Del. Audubon Soc'y v. Salazar, No. 10-985 (D. Del. July 28, 2011) [hereinafter Defs.'

Reply].

## II.    RELEVANT STATUTES

### A.    The APA

My review of a final agency action is governed by the APA.  5 U.S.C. §§ 704, 706; see

Soc'y Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 178 (3d Cir. 2000) (quoting Citizens

to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-17 (1971)).  Such action shall be set aside

if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A).  "To make this finding the court must consider whether the decision was

based on a consideration of the relevant factors and whether there has been a clear error of

judgment."  Overton Park, 401 U.S. at 416.

When evaluating a final agency action under the APA, I must conduct a "searching and

careful" review of the facts.  Id.  Such review is limited to the administrative record that was

before the agency at the time it made the decision, or took the final action, at issue.  Id. at 420.  I

may not "substitute [my] judgment for that of the agency."  Id. at 416.  Indeed, "the ultimate

standard of review [under the APA] is a narrow one."  Id.  "[A] reviewing court must be at its

most deferential" when it examines an agency action involving assessment of technical,

scientific, or otherwise specialized areas within the agency's expertise.  Balt. Gas & Elec. Co. v.

Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983); see also Marsh v. Or. Natural Res.

Council, 490 U.S. 360, 377 (1989).

**B.     NEPA**

NEPA constitutes a "national policy which will encourage productive and enjoyable

harmony between man and his environment," and "promote efforts which will prevent or

eliminate damage to the environment."  42 U.S.C. § 4321.  To achieve these objectives, NEPA

requires federal agencies "to undertake analyses of the environmental impact of their proposals

and actions."  Dep't of Transp. v. Pub. Citizens, 541 U.S. 752, 756-57 (2004).  "NEPA imposes

only procedural requirements."  Id. at 756.  It "does not mandate particular results."  Robertson

v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).  "[I]f a federal agency has heard

all the objections to a plan and considered all the sensible options before it, the agency has

fulfilled its duty."  Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997).

Before undertaking "major [f]ederal actions significantly affecting the quality of the

human environment," NEPA requires agencies to prepare comprehensive Environmental Impact

Statements ("EIS").  42 U.S.C. § 4332(2)(C); Pub. Citizens, 541 U.S. at 757; see 40 C.F.R. §

1502.1 et seq. (providing specific guidance as to the nature and content of an EIS).  Unless the

need for an EIS, or lack thereof, is immediately apparent, agencies first prepare "concise public"

EAs in order to assess whether the federal action at issue will have a significant impact on the

environment.  40 C.F.R. §§ 1501.4(b), 1508.9(a); see Pub. Citizens, 541 U.S. at 757.  If the EA

concludes the action is likely to "significantly affect" the environment, an EIS must follow.  42

U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  If not, the agency presents its reasons for not issuing

an EIS in a Finding of No Significant Impact ("FONSI").  40 C.F.R. §§ 1501.4(e), 1508.13.

"An agency's decision not to prepare an EIS can be set aside only upon a showing that it

was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Pub. Citizens, 541 U.S. at 763 (quoting the APA); see Soc'y Hill Towers, 210 F.3d at 178-79. My review of the adequacy of a FONSI must "determine whether the agency has taken a 'hard look' at the consequences of its actions, 'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement of reasons to explain why a project's impacts are insignificant.'" Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001) (citations omitted) (quoting Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998), and Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir. 2000)); see Save Our Cumberland Mountains v. Kempthorne, 453 F.3d 334, 339 (6th Cir. 2006); Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1009 (9th Cir. 2006).  A plaintiff challenging an agency's decision not to prepare an EIS bears the burden of showing the decision was arbitrary and capricious.  Davis v. Mineta, 302 F.3d 1104, 1117 (10th Cir. 2002).

### C.   RIA

The RIA defines the mission of the System as administration of "a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."  16 U.S.C. § 668dd(a)(2).  It requires that "each refuge . . . be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established."  § 668dd(a)(3)(A).  It further directs that "the biological integrity, diversity, and environmental health of the system [must be] maintained."  § 668dd(a)(4)(B).

The RIA limits use of refuge land to those uses that are "compatible with the major purposes for which such areas were established."  § 668dd(d)(1)(A); see § 668dd(d)(3)(A)(i).  A

"compatible use" is "a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." § 668ee(1). The RIA also mandates that "comprehensive conservation plans" be prepared by October 2012 to direct the management of each refuge in the System. § 668dd(e).

## III.   ANALYSIS

Entry of summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The facts here are thoroughly developed in the extensive administrative record and are undisputed; the only conflicts remaining are legal and, thus, appropriate for resolution via the parties' cross-motions for summary judgment. For the reasons that follow, application of the legal standards described above to the undisputed facts establishes Defendants are entitled to summary judgment on each of Plaintiffs' claims.

### A.   Alleged Violations of NEPA

#### 1.   Purpose, Need, and Reasonable Alternatives

According to Plaintiffs, the EA's stated purpose for the Project -- "to maintain the current habitats in a stable condition in order to prevent disintegration of the marsh and peat in the Unit II impoundment while a long-term restoration plan is developed" -- "is not accurately or clearly articulated." Pls.' Br. at 14. Plaintiffs suggest the EA "contains substantial uncertainty" as to whether the Project will serve the stated purpose. Id. They further contend the true purpose of the Project is "to decrease flooding on Prime Hoo[k] Road, one of the major egresses to the private beach community," id., calling statements to the contrary in the EA "mere lip service," id. at 15. Beyond attacking the Project's purpose, Plaintiffs also criticize Defendants for

9

"fail[ing] to consider appropriate alternatives to the proposed project." Id.  The record contains no support for these claims.

An EA must include a "brief discussion[] of the need for the proposal."  40 C.F.R. § 1508.9(b).  Courts afford agencies "considerable discretion to define the purpose and need of a project."  Friends of Se.'s Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir. 1998).  However, that discretion is not unfettered.  An agency may not "define [a] project so narrowly that it foreclose[s] a reasonable consideration of alternatives."  Davis, 302 F.3d at 1119; see Simmons, 120 F.3d at 666 ("One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration . . . .").

The range of alternatives an agency must consider and discuss under NEPA "is a matter within [the] agency's discretion."  Friends of Ompompanoosuc v. Fed. Energy Regulatory Comm'n, 968 F.2d 1549, 1558 (2d Cir. 1992).  NEPA requires agencies to consider only those alternatives that are reasonable and practical.  See Davis, 302 F.3d at 1120.  An agency may reject "alternatives that [do] not meet the purpose and need of the project."  Id. at 1119.  When an agency permissibly prepares an EA, rather than a more comprehensive EIS, "the agency has determined that the proposed project will have minimal environmental consequences, and accordingly its duty to consider environment-friendly alternatives is less pressing."  Save Our Cumberland Mountains, 453 F.3d at 342.  Although an EA must still reflect "consideration of some range of alternatives," "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined . . . will have no significant environmental effects anyway."  Sierra Club v. Espy, 38 F.3d 792, 803 (5th Cir. 1994).

Here, the FWS clearly defined the purpose of the Project as follows: "to re-establish some water management capability in Unit II, permitting time for rigorous monitoring of the system and development of a long-term restoration and management plan based upon the newly collected scientific information." R. at 21. The EA justifies the Project, explaining "inaction in the short term . . . could cause the inlets to widen, increasing tidal flows and the break-up of the peat layer beneath the dead freshwater vegetation, so that restoration strategies . . . will be made far more difficult by conversion of the area to open water." Id. These statements are echoed throughout the EA. See, e.g., R. at 22-23, 29, 37-39; see also R. at 540 (noting in an E-mail circulating a draft EA that "this is a temporary solution" aimed at "slow[ing] things down and figur[ing] them out"). Moreover, the FWS acknowledges the public's "perception that the [Project] will help protect adjacent private lands" from flooding, but repeatedly questions the accuracy of that perception and explicitly disavows it as a purpose for the Project. R. at 24; see also R. at 28, 51, 62, 65.

The Project's purpose is not vague, nor is it written in such a way that it artificially limits the range of alternatives available to the FWS.[4] Although Plaintiffs suggest there is "substantial uncertainty as to whether building up the dune . . . will actually restore water management capacity," Pls.' Br. at 14, the EA reveals no such uncertainty. Past dune repair efforts have been undertaken to preserve water management capabilities, and have been temporarily effective. R.

---

[4]    If, for example, the purpose were "to remove overwash sand and sediment from the Refuge's marsh and restore it to the breached areas of the dune line," there would be a basis for questioning whether the EA had constricted the purpose so as to avoid reasonable alternatives and limit consideration to the single proposed action. Cf. Simmons, 120 F.3d at 667 (finding the drafters of an EIS aimed at increasing water supplies for two Illinois towns impermissibly restricted available alternatives by limiting the stated purpose to finding a way to supply both towns from a single source, thus eliminating consideration of less damanging multiple-source alternatives).

at 18, 1726, 4242-91, 4325, 4433.  The only uncertainty evident from the EA -- and reflected in the portions of it cited by Plaintiffs -- surrounds what strategy the FWS will select to manage the Refuge in the long term.  See, e.g., R. at 22 ("[T]he optimal restoration plan for the entire system is not immediately clear, and there is enough uncertainty regarding how the system will respond to rapidly changing conditions to warrant further study and consideration.").  A long-term strategy will be the subject of further environmental studies and reports.  R. at 21.  As it outlined in the EA, the FWS reasonably believes the necessary studies will be facilitated by taking steps to temporarily prevent further saltwater intrusion in Unit II.  Id.

I reject Plaintiffs' invitation to cast aside the plain language of the EA, question the sincerity of its stated purpose, and conclude the Project's true purpose is simply to placate private landowners.  See Pls.' Br. at 14-15.  Plaintiffs speculate about "what appears to be the real purpose of this project."  Id. at 14.  Although some local residents apparently support the Project based on their belief it will eliminate flooding on their property and the access roads leading to it, see R. at 62, 89, FWS does not share that belief, see R. at 24.  Plaintiffs point to an earlier draft of the EA as evidence that "reducing flooding" is the Project's actual purpose.  See Pls.' Br. at 14; R. at 253.  The draft, however, described the purpose as "to minimize impacts of coastal flooding and reduce erosion for the short term while a long-term restoration and management plan . . . is developed."  R. at 253.  That early description of the purpose is not inconsistent with the final EA, nor does it establish a hidden goal to protect private property.

Although the Project will take sand from Refuge property to rebuild dunes on both Refuge and private property, that fact does not suggest the FWS's objective is the protection of private property, as Plaintiffs argue.  See Pls.' Br. at 14.  Rather, to temporarily maintain the status quo at the Refuge, the Project necessarily repairs dune breaches on private property, since

12

water flows through such breaches into the Refuge itself.  See R. at 18-19, 21.

Plaintiffs' attack on the EA for its alleged failure to consider sufficient alternatives to the Project is similarly unpersuasive.  The EA contains detailed discussion of three alternatives: doing nothing, rebuilding the dunes using sand that has washed onto the Refuge, and rebuilding the dunes using off-site sand.  R. at 29.  The EA further reflects the FWS considered four other alternatives, but elected not to study them in detail for various reasons.[5]  Importantly, "[P]laintiffs have not identified a single alternative that the agency should have considered but did not."[6]  Save Our Cumberland Mountains, 453 F.3d at 347; see City of Angoon v. Hodel, 803 F.2d 1016, 1022 (9th Cir. 1986) (plaintiffs "had not offered a specific, detailed counterproposal that had a chance of success"); cf. Simmons, 120 F.3d at 669 (plaintiffs had advanced "at least one concrete alternative that seems reasonable").

Under these circumstances, I find no basis for questioning the statement of purpose or the discussion of alternatives set forth in the EA.  See Citizens Against Burlington, Inc. v. Busey,

---

[5]      Those alternatives were: (1) elevating Prime Hook Road, which would address only community concerns about access to private homes and would require significant planning, funding, and coordination with Delaware's Department of Transportation; (2) use of beachfront sand, which would not be permitted by Delaware; (3) using sand from the Refuge to repair dunes on Refuge land, and sand from private land to repair dunes on private land, which would result in a shortage of sand for use on private land since sand from private dunes has washed onto Refuge land; and (4) dredging off-shore sand and pumping it onto the beach, which was deemed too costly.  R. at 23, 34-35.

[6]      In their opening brief, Plaintiffs criticized the EA for even "briefly considering" raising Prime Hook Road.  Pls.' Br. at 17.  They implied raising the road would not "help control water in Unit II," and "is more indicia that the stated purpose of this project is not the true purpose." Id.  However, after Defendants noted Plaintiffs' failure to specify any alternatives the EA should have discussed, Defs.' Br. at 26-27, Plaintiffs instead claimed "[r]aising the road is a reasonable and viable alternative" that the FWS failed to adequately consider, Pls.' Reply at 5.  In any event, the FWS did consider that alternative and provided a reasonable explanation for its rejection.  R. at 34.

938 F.2d 190, 196 (D.C. Cir. 1991) (upholding agency statement of purpose and discussion of alternatives as long as they are "reasonable"); see also Envtl. Prot. Info. Ctr., 451 F.3d at 1016 (EA reasonably considered in detail three alternatives, two of which were similar, and explained why several other alternatives were eliminated from consideration).

2.    Context and Intensity

Plaintiffs next assert they should prevail on their NEPA claim because the EA did not adequately consider the various factors relevant to determining the significance of the Project's environmental impacts.  Pls.' Br. at 17-33.  However, a fair reading of the EA -- especially through the requisite deferential lens, see Pub. Citizens, 541 U.S. at 763 -- reveals the FWS complied with all relevant standards and procedural guidelines.

To determine whether a proposed action will have "significant" impacts on the environment, an agency must consider "both context and intensity."  40 C.F.R. § 1508.27. Context includes "society as a whole . . ., the affected region, the affected interests, and the locality," and requires consideration of both short- and long-term effects.  § 1508.27(a). Intensity, or "severity of impact," should include consideration of ten enumerated factors, the following seven of which are at issue here:

- the degree to which the possible environmental effects of the project are "highly uncertain";

- the degree to which the environmental effects of the project are likely to be "highly controversial";

- "unique characteristics of the geographic area";

- the degree to which the project "may adversely affect an endangered or threatened species or its [critical] habitat";

- whether the project will violate federal or state law;

14

- the degree to which the project "may establish a precedent for future actions with significant effects"; and

- "whether the action is related to other actions with individually insignificant but cumulatively significant impacts."

§ 1508.27(b); see Soc'y Hill Towers, 210 F.3d at 180 (the ten intensity factors "should be considered").  Presence of enumerated intensity factors does not mandate a finding of significance; rather, the agency must establish only that it addressed and evaluated the factors.  See Coliseum Square Ass'n v. Jackson, 465 F.3d 215, 233-34 (5th Cir. 2006).

Preliminarily, Plaintiffs' cursory assertion the FWS failed to consider the context of the Project and "ignored the distinctive and irreplaceable significance of the [Refuge] from a national, and global perspective" is meritless.[7]  Pls.' Br. at 18.  The EA is replete with statements evidencing consideration of the Project's context.  See, e.g., R. at 18-20 (describing current conditions in the Project area); R. at 23 (noting concerns of local residents); R. at 25-26 (outlining factors influencing local beaches and coastal areas in general); R. at 45-46 (describing the "worldwide ecological significance" of the Refuge).

As for intensity, Plaintiffs expend much effort urging that the EA reflects deficient consideration of the regulatory factors listed above, but their contentions amount to little more than simple disagreement with FWS's conclusions.  See Coliseum Square, 465 F.3d at 234.

Plaintiffs first argue an EIS was required because the EA concedes the long- and short-term effects of the Project are highly uncertain.  Pls.' Br. at 18-21.  However, as discussed previously, the only uncertainty referenced in the EA relates to selection of a long-term management strategy for the Refuge, and the FWS is quite candid about that uncertainty.  See,

---

[7]     Perhaps recognizing this, Plaintiffs essentially abandoned this assertion in their reply brief.  See Pls.' Reply at 5.

e.g., R. at 21-22, 32, 38-39, 57-58.  The FWS expresses no such uncertainty about the effects of the short-term plan to restore the dunes and preserve current conditions for further study. Although the final EA does not pinpoint exactly how much sand will be needed, R. at 32, it limits the amount of sand that will be taken from the Refuge and allows for use of supplemental off-site sand based on public comments to the draft EA, R. at 31-32, 83.  The anticipated environmental consequences of the Project are extensively catalogued in the EA and are not uncertain.  R. at 35-55.  Although Plaintiffs might disagree with the FWS's assessment, they have offered no evidence demonstrating the effects are "highly uncertain" and require further study via an EIS.

Plaintiffs next suggest the EA "failed to consider the gravity of the controversy surrounding the project."  Pls.' Br. at 21-25.  The "highly controversial" factor, however, requires an agency to consider only whether "a substantial dispute exists as to the size, nature or effect of the [project]," and not whether there is any general opposition to it.  Soc'y Hill Towers, 210 F.3d at 183-84 (quoting Hanly v. Kleindienst, 471 F.2d 823, 830 (2d Cir. 1972)); see Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1122 (9th Cir. 2000). Here, the EA contains approximately fifteen pages addressing specific public comments and objections, including those raised by PEER and DNREC and cited by Plaintiffs.  R. at 56-72; Pls.' Br. at 22-23.  Moreover, the draft EA reviewed and commented on by the public was amended in various respects in response to comments received.  R. at 14, 83-84.  The final EA explicitly confronts public concerns, catalogues scientific research outlining risks and benefits of the Project, and acknowledges certain environmental impacts but finds they are not significant.[8]

---

[8]      Although projects termed "temporary" still can have adverse impacts on the environment, as the EA here acknowledges, "an adverse effect still must be significant to require

See, e.g., R. at 21 (acknowledging repeated dune reconstruction "could further weaken the integrity of the dune and marsh system over time"); R. at 44 (conceding vegetation in overwash areas will be disturbed, but stating "little vegetation has colonized the site" and the loss would be mitigated by replanting dune grass after rebuilding is complete);  R. at 57 (addressing concern about lack of sufficient sand).  This is all NEPA requires.[9]

Plaintiffs' contention that the EA gave insufficient consideration to "the unique characteristics of the geographic area" at issue, Pls.' Br. at 26-27, is refuted by the EA's extensive focus on the Refuge and its unique environmental attributes.  Plaintiffs baldly assert the EA "barely touched on the impacts to migratory birds," id. at 27, but they point to no specific impact the FWS ignored.  Instead, Plaintiffs again describe the worldwide significance of the Refuge, citing the EA itself as support for their description.  See id. at 26.  The bulk of the EA is focused on the unique circumstances present at the Refuge, including its marsh habitats, the migratory birds, and other wildlife.  See generally R. at 15-55.  The EA outlines aspects of the Project that will minimize impacts on the Refuge and its wildlife.  See, e.g., R. at 38 (timing of Project should maximize available sand); R. at 44 (replanting dune grass should mitigate harm to vegetation); R. at 47 (timing of Project should avoid interference with horseshoe crab spawning and migratory bird nesting).  This is enough to demonstrate the agency adequately considered

---

an EIS."  Envtl. Prot. Info. Ctr., 451 F.3d at 1013.

[9]     Plaintiffs exaggerate the level of controversy by selectively summarizing DNREC's comments on the draft EA (which raised concerns but offered solutions to mitigate them, such as scheduling the work after the fall migratory period ends, R. at 177-81), misconstruing an early draft of the EA (which noted potential negative impacts, but did not conclude they were "significant," and did not account for scientific literature on the risks of allowing rapid intrusion of saltwater in a freshwater marsh system, R. at 590 & attachment), and imputing controversy about how to best manage the Refuge in the long-term to this less-controversial, short-term measure.  Pls.' Br. at 22-25.

the Refuge's "unique characteristics."

Next, Plaintiffs fault the FWS for failing to consider the Project's impacts on two federally listed endangered species. Pls.' Br. at 27-30. The species at issue are the piping plover and the Delmarva fox squirrel. R. at 55. To assess what impact, if any, the Project would have on those species, the FWS consulted with its Chesapeake Bay Field Office, which prepared a biological assessment. Id.; R. at 998-1001. The assessment concluded the Project would not impact any habitat of the Delmarva fox squirrel, which "primarily utilize mature blocks of forest." R. at 999. As to the piping plover, the assessment found no significant impact based on several factors: because the amount of sand scraped from the Refuge would be limited, "suitable nesting habitat will remain;" "an abundance" of other habitat areas are present within the marsh, along the shore, and on an overwash area to the north that would remain; and the Project would take place after nesting season. Id.

Plaintiffs nevertheless speculate that some unspecified impact may have been ignored in the EA.[10] More is required before I can disturb an agency's conclusions under NEPA. Cf. Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257 (10th Cir. 2004) (rejecting an agency's reliance on a biological opinion where the opinion admitted it could not predict whether the species at issue would be jeopardized); Anglers of the Au Sable v. U.S. Forest Serv., 565 F. Supp. 2d 812 (E.D. Mich. 2008) (rejecting an agency's reliance on a biological assessment that contained factual inaccuracies and summarily found no impact from a project that would permanently alter the species' designated management area).

---

[10] Plaintiffs' speculation is explicit: "It is hard to comprehend how such significant changes would not affect endangered species . . . ." Pls.' Br. at 28. I cannot second-guess an agency's judgment regarding a matter within its expertise based on such unsupported hypotheses.

18

Plaintiffs further attack the EA by claiming it does not account for the ways in which the Project violates the law. Pls. Br. at 30-31. Specifically, Plaintiffs claim the Project violates RIA, as well as the FWS's own policies. Id. As discussed in the section that follows, Plaintiffs have not demonstrated any violation of RIA. See Analysis § III.B, infra. In addition, the EA catalogues the various laws and policies that guided the FWS in its preparation, including the directive on "biological integrity, diversity, and environmental health of the Refuge System" referenced by Plaintiffs. See R. at 20-21; see also R. at 55-56 (listing other agencies and programs consulted in order to comply with various laws). The FWS plainly considered relevant laws and policies, including those raised by Plaintiffs, as required under NEPA.[11]

Finally, Plaintiffs contend the EA "ignored the cumulative impacts of rebuilding the dunes," and "does not address . . . the precedential effect [the] action will have." Pls.' Br. at 32-33. This claim is contradicted by the EA, which detailed past dune repair efforts and their effects, R. at 18, discussed long-term management strategies and concluded the Project would not restrict future decision-making, R. at 21-24, 55, and devoted an entire section to the Project's "cumulative impacts," R. at 53-55.[12] This satisfies NEPA. See Coliseum Square, 465 F.3d at 233-34.

---

[11]    Characterizing the Project as "[d]estruction of [a] rare environment by the agency charged with protecting it" does nothing to advance Plaintiff's claim, Pls.' Br. at 31, particularly in light of the evidence showing the FWS is reasonably acting to preserve its ability to make a sound and informed long-term refuge management decision to best preserve the Refuge. Selectively quoting a provision of the FWS Manual that contemplates preparation of an EIS where actions will adversely impact wildlife refuges or wetland areas, but only "depending on the severity and duration of effects," 550 FWS 3.3(B)(2)(g), is similarly unhelpful. See Pls.' Br. at 31.

[12]    Rather than setting a new precedent, the Project adheres to precedent by following prior dune rebuilding efforts. R. at 17-18.

In sum, contrary to Plaintiffs' assertions, the EA demonstrates the FWS considered all of the intensity factors required under NEPA and its implementing regulations. "[P]laintiffs do not adduce evidence suggesting [the agency's] evaluation [of the factors] was insufficient, but simply assert disagreement with the conclusion. Accordingly, they have not met their burden to show [the agency] acted arbitrarily or capriciously." Id. at 234.

3.      Prejudgment of the FONSI

In their final attack under NEPA, Plaintiffs argue the FWS acted arbitrarily and capriciously by determining a FONSI would be issued before the EA process was complete. Pls.' Br. at 33-36. The record, however, provides no support for Plaintiffs' view.

An agency must conduct its environmental review of a project "early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5 (citations omitted). "NEPA does not require that agency officials be 'subjectively impartial.' The statute does require, however, that projects be objectively evaluated." Metcalf, 214 F.3d at 1142 (citation omitted). In determining whether an agency prejudged the impact of its intended actions, courts primarily look to the EA itself, rather than attempting to divine "the alleged subjective intent of agency personnel . . . through selective quotations from email trails." Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 199 (4th Cir. 2005).

Plaintiffs ask me to do precisely the opposite -- to disregard the extensive analysis in the EA in favor of a handful of statements by agency officials cherry-picked from the record. See Pls.' Br. at 34-35. The depth of analysis in the final EA, coupled with the level of internal scrutiny to which early drafts of the EA were subjected, does not suggest an agency that was acting hastily to craft a document supporting a predetermined FONSI. See, e.g., R. at 544

20

(noting a need for more socioeconomic analysis in the draft EA); R. at 566 (calling the EA "very important" and seeking "very critical review" of a draft); R. at 570 (describing edits to the draft EA and seeking additional scientific support). Moreover, the portions of the record cited by Plaintiffs do not portray an agency pushing forward with its predetermined plan without first completing an objective analysis. See, e.g., R. at 10811 (stating work "could" move forward after the EA is completed and the public has commented on it); R. at 11086 (setting a timetable for the analysis, including a date for the final EA and FONSI "unless public comment requires [further] analysis"); R. at 11054 (projecting when work might begin "[i]f permits are in hand").

Further, the record does not contain the type of evidence that has led other courts to reject FONSI determinations as having been prejudged. Cf. Davis, 302 F.3d at 1112 (entity hired to prepare EA was contractually obligated to issue a FONSI); Metcalf, 214 F.3d at 1142-43 (two contracts signed, committing resources to project, before EA completed); Citizens Advisory Comm. on Private Prisons, Inc. v. U.S. Dep't of Justice, 197 F. Supp. 2d 226, 242 (W.D. Pa. 2001) (contract awarded and construction began before EA completed); San Luis Valley Ecosystem v. U.S. Forest Serv., No. 04-1071, 2007 WL 1463855, at *11 (D. Colo. May 17, 2007) (draft EA changed to avoid need for EIS and enable issuance of FONSI before necessary appraisals expired).

Put simply, Plaintiffs have not demonstrated Defendants acted arbitrarily and capriciously, or that the FWS failed to take a "hard look" at the environmental consequences of the Project before issuing the FONSI, or at any time throughout the EA process. See Nat'l Parks & Conservation Ass'n, 241 F.3d at 730; Soc'y Hill Towers, 210 F.3d at 178-79. Accordingly, Plaintiffs' NEPA claim fails as a matter of law.

B.      Alleged Violations of RIA

1.      System Mission and Refuge Purpose

Plaintiffs' first theory relies on their view that the Project "is solely for the benefit of private property owners and does not advance any Refuge purpose." Pls.' Br. at 38 (emphasis omitted). They construe the Project as one that requires "damage and destruction of migratory bird habitat so that sufficient sand can be generated to protect private property." Id. at 37. In essence, this argument is intertwined with Plaintiffs' failed claim that the Project's stated purpose is not its true purpose.[13] See id. at 14-15; Analysis § III.A.1, supra.

Although the record contains letters from private property owners urging the FWS to proceed with the Project and expressing their subjective hope and belief it will benefit them, see Pls.' Br. at 38 (citing examples from the record), it contains no evidence revealing the FWS's improper motivation for undertaking the Project. Rather, the record establishes the FWS reasonably believes short-term dune repair will enable it to assess the current state of the impaired marshes, to slow processes that might lead to a conversion of the marshes to open water, and to assess how best to manage the area in the long-term while preserving it for use by migratory birds and other wildlife. R. at 21-24. Plaintiffs largely ignore the possibility, reasonably contemplated by the FWS and supported by scientific literature cited in the EA, that failing to undertake the Project could result in the Unit II marsh converting to open water. See R. at 44-47, 8370-81, 8621-49. This could, of course, permanently eliminate any migratory bird

---

[13]     Plaintiffs further fault Defendants for "admitting" in the EA that the Project will temporarily alter and negatively impact a portion of the Refuge. Pls.' Br. at 37-38. However, NEPA required Defendants to explore those changes and negative effects in the EA, and Plaintiffs have offered no evidence to undermine Defendants' conclusion that such effects will not be significant or long-term, particularly in light of steps that will be taken to mitigate them.

habitat therein and prevent the FWS from implementing a long-term management plan.  Id.
Additionally, the record establishes the Project will be undertaken at a time, and in a manner,
that will minimize any harm to migratory birds using the Refuge.  R. at 6, 32.  Under these
circumstances, Plaintiffs have not established the Project is inconsistent with the mission of the
System or the purpose of the Refuge.

    2.  Sound Professional Judgment

   Plaintiffs' second theory depends entirely on the success of their NEPA claim.  They
assert Defendants could not have exercised sound professional judgment when issuing the CD,
because the Project violates NEPA.  See Pls.' Br. at 39; see also 16 U.S.C. § 668ee(1) (requiring
the use of "sound professional judgment" in assessing the compatibility of a particular use with
refuge purposes and the mission of the System).  For the reasons discussed above, see Analysis §
III.A, supra, Plaintiffs' NEPA claim is meritless.  Plaintiffs have provided no other basis for
questioning whether the CD was a product of "sound professional judgment."  See Pls.' Br. at
39; see also Pls.' Reply at 11-15 (apparently abandoning this basis for the RIA claim).  Because
Defendants have not violated NEPA, Plaintiffs' related RIA claim fails.

    3.  Economic Use

   Plaintiffs assert the FWS violated the RIA by failing to render its CD using the
appropriate standard.  Pls.' Br. at 40-42.  Alleging the Project is an "economic use" of Refuge
resources, they contend it required additional permits and a finding it "contributes to the
achievement of" the Refuge's purpose or the System's mission.  Id.; 50 C.F.R. § 29.1.  Plaintiffs'
fail to cite a single analogous case to support their argument.

   Economic uses of refuge resources are permitted only "where [the agency] determine[s]
that the use contributes to the achievement of the national wildlife refuge purposes or the

23

National Wildlife Refuge System mission." 50 C.F.R. § 29.1 (internally referencing 16 U.S.C. § 715s regarding revenue generated in FWS areas). Federal regulations do not define the term "economic use." See 50 C.F.R. § 25.12. The FWS's Refuge Manual, however, contains the following definition: "Any activity involving the use of a refuge or its resources for a profit." 5 RM § 17.6(D). In a separate FWS policy, the term "refuge management economic activity" is defined as "[a] refuge management activity on a national wildlife refuge that results in generation of a commodity which is or can be sold for income or revenue or traded for goods or services." 603 FW § 2.6(N).

It is undisputed that the sand scraped from the Refuge will be used to fill the breaches and repair the dune. R. at 1, 14. It will not be sold, and will not generate a profit. See Pls.' Reply at 14 (arguing only that the sand could be sold). It is further undisputed that sand is a commodity that could be sold for a profit. See R. at 34 (stating off-site sand could be purchased at a price of $15 per cubic yard ). Therefore, under the definitions cited above, the Project may be characterized as a "refuge management economic activity," but does not qualify as an "economic use." See 5 RM § 17.6(D); 603 FW § 2.6(N). Plaintiffs have not cited -- and I have not located -- any source stating the terms "economic use" and "refuge management economic activity" are synonymous, or finding the heightened CD standard applies to "refuge management economic activities" that are not "economic uses."[14]

---

[14]    The modified CD standard cited by Plaintiffs applies only to "economic uses," or uses that actually generate income. See 50 C.F.R. § 29.1; 5 RM § 17.6(D). The FWS's policies imply the regular CD standard -- and the one used by FWS here, R. at 7 -- may apply to "refuge management economic activities." See 603 FW § 2.6(A)-(B), 2.9, 2.10 (requiring compatibility determinations for "refuge management economic activities," and defining "compatible use" as one "that, based on sound professional judgment, will not materially interfere with or detract from the fulfillment of the [System's] mission or the purposes of the [Refuge]").

The FWS categorized the Project as a "specialized use," rather than an "economic use." See Defs.' Br. at 42; R. at 2 (referencing the need for an "SUP," or "Specialized Use Permit"). A "specialized use" is "[a]ny refuge service, facility, privilege, or product of the soil provided at refuge expense and not usually available to the general public . . . ."  5 RM § 17.6(A).  An agency's classification of projects within its area of expertise, using definitions contained in its own policy manuals, is entitled to deference.  See Balt. Gas & Elec., 462 U.S. at 103.  Plaintiffs have failed to demonstrate Defendants acted arbitrarily or capriciously, abused their discretion, or otherwise violated any law in determining the type of use, the applicable CD standard, and the necessary permits.  5 U.S.C. § 706(2)(A).  Accordingly, Plaintiffs' cannot prevail on their RIA claim.

An appropriate order follows.